IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

JAMES J. HOLLIS,

        CASE NO. 2:11-CV-1133
   Petitioner,        JUDGE JAMES L. GRAHAM
        Magistrate Judge Elizabeth A. Preston Deavers

   v.

ROB JEFFREYS, WARDEN,

   Respondent.

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, brings the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  This matter is before the Court on the instant petition, Respondent's *Return of Writ,* Petitioner's *Traverse,* and the exhibits of the parties.  For the reasons that follow, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED.**

**Facts and Procedural History:**

The Ohio Fourth District Court of Appeals summarized the facts and procedural history of this case as follows:

> The victim, an 83 year-old woman named Mary E. Cook, lived at 213 W. Corwin St. in Circleville, Ohio. She had an arrangement with her neighbor whereby she would pin her drapes closed each night and then unpin them each morning, to signal that she was okay. When her neighbor arrived home in the late afternoon on July 21, 1990, he noticed that Mary's drapes were still closed and he called the police. The Circleville police arrived soon after to conduct a well-being check. Upon arriving, the responding officers found the doors to Mary's house locked, no signs of forced entry, and an open window with an overturned bucket placed under it in the back of the house. [FN1] With one officer hoisting the other officer through the window, entry was gained into the house where Mary was found dead in her bed. Her body was nude and blood-soaked linens were found wrapped around her head. Her house appeared to have been ransacked. All of the bed linens were removed, packaged and sent to BCI for analysis, which identified

the presence of pubic hairs that did not belong to the victim. Also, it was determined that saliva located on bite marks left on the victim belonged to someone other than the victim.

FN1. The record indicates that this was not unusual as Mary normally left the window open in order for cats to go in and out of the house.

Although several individuals, including Appellant, were questioned as part of the police investigation surrounding Mary's murder, no charges were brought. Appellant, when questioned, offered an alibi, claiming to have been with friends at a party in Washington Court House at the time of the victim's murder. Two years later, when questioned again after committing other various crimes, Appellant voluntarily submitted pubic hair and saliva standards. Test results based upon these standards indicated that Appellant was not a match to the evidence recovered from the crime scene and as such, he was removed from the suspect list for the murder of Mary Cook.

It was not until several years later, sometime in late 2005 or early 2006, once DNA analysis had become available, that some of the evidence gathered at the crime scene, specifically the pubic hairs, were resubmitted for testing. In July of 2007, the Circleville police department was notified that a match had been identified, linking Appellant's DNA to the crime. Specifically, the testing indicated that pubic hairs found on the bedding wrapped around the victim's head which had been recovered from the crime scene were a low level match to Appellant's DNA profile. [FN2] Based upon this, Appellant was arrested.

FN2. This initial testing indicated there was a 1 in 682 chance that the recovered pubic hairs did not belong to Appellant.

At this point, all of the evidence gathered on the day of the crime was resubmitted to BCI for retesting. During this process, additional pubic hairs were identified in the bedding that was wrapped around the victim's head. This additional testing indicated there was only a 1 in 28,340,000,000,000 chance that the newly identified pubic hairs did not belong to Appellant. [FN3] Additional DNA evidence in the form of semen and saliva were discovered at this time also. Testing on these samples did not match Appellant, and instead indicated that another individual was also present at the scene of the crime.

FN3. Although Appellant challenged the collection, handling and analysis of this DNA evidence at the trial of this matter, he does not raise such challenges on appeal and instead argues alternative theories as to how it could have legitimately gotten there.

On June 6, 2008, Appellant was indicted for complicity to aggravated murder, an unspecified felony, in violation of R.C. 2923.03 and 2903.01(B), and complicity to murder, an unspecified felony, in violation of R.C. 2923.03 and 2903.02(A). Appellant pled not guilty to the charges and the matter proceeded to a jury trial.

At trial, the State presented multiple witnesses, including Officer Tom Royster, Sergeant Donald Barton, Dr. Michael Geron, Dr. Patrick Fardal, Detective Kevin Clark, Michelle Yezzo and Mark Losko. Officer Royster testified to being contacted to conduct a well-being check on Mary Cook on July 21, 1990, pursuant to a call from Mary's neighbor. He testified that upon arriving at the house, he found newspapers from the last two days on Mary's front porch, and he also found an open window in the rear with an overturned bucket beneath it. He explained that he hoisted another officer through the window in order to enter the house. Upon entering the house the officers found Mary Cook's body in her bedroom.

Sergeant Barton testified to being dispatched to Mary Cook's home. He testified that when he arrived Officer Royster was present, as well as a Lieutenant Kinney, and that Coroner Geron, assistant prosecutor Gene Long and BCI arrived while he was there. He testified that the condition of Mary's house indicated signs of struggle. He testified that the bed spread, mattress cover, pink fitted bed sheet, nightgown and pillow case that were wrapped around the victim's head were removed and placed into a large plastic bag to be held as evidence, and were sent to BCI for testing. Sergeant Barton testified a second time at trial, explaining that as part of the murder investigation, Appellant was questioned approximately three days after the murder because his name had been provided as someone who had done yard work for Mary. He stated that Appellant provided an alibi during the interview, which was verified, and that as a result they focused on other suspects.

Pickaway County Coroner Michael Geron, M.D. also testified. He testified that the victim was found dead, nude and "spread eagled" in the bed, her head wrapped in blood-soaked clothing. He testified that the victim appeared to have suffered multiple blows to her head by a blunt object and also stated that the victim had bite

3

marks on her right breast and lower right leg. He testified that the exact time of death was unknown, but that in his opinion she had been dead at least 12 to 14 hours.

Dr. Patrick Fardal, retired chief forensic pathologist for Franklin County who performed the autopsy on the victim, also testified at trial. He testified that the victim had sustained traumatic injuries from a foreign object to her head, face and eye had sustained a broken neck. He also testified that her autopsy indicated that she has sustained injuries in her vaginal and anal areas from apparent insertion of a foreign object. Dr. Fardal testified that swabs were taken to test for saliva and semen. He testified that the victim's cause of death was a fracture of her sixth cervical vertebra.

Detective Kevin Clark testified that he spent days after the victim's murder canvassing the neighborhood to develop a list of potential suspects, compiling names of over forty individuals who were questioned. He explained that after two years, Appellant's name kept coming up and that in 1992 Appellant was brought back in for questioning. It was during this round of questioning that Appellant voluntarily submitted saliva and pubic hair standards, which were sent to BCI. The form submitted to BCI along with the standards indicated that Appellant was a black male, rather than accurately stating he was a biracial male. Based upon the results of this submission, Appellant was ruled out as a suspect.

Detective Clark further testified that a decision was made in 2006 to resubmit the hairs that had been recovered from the crime scene for additional testing, due to the availability of new DNA testing methods. At that point, an initial, although low-level, match was made with Appellant, indicating that the hairs submitted had a 1 in 682 chance of not belonging to Appellant. Detective Clark explained that Appellant was arrested based upon the information and that Appellant was again interviewed. The record reflects that a tape recording of Appellant's interview was played for the jury. In the recording, Appellant acknowledges having known Mary Cook and that he performed various odd jobs for her. He stated that he had been in her house on several occasions prior to her death and had used her bathroom. As such, he offered some theories as to how his pubic hair may have legitimately gotten into her house and once again claimed to have been at a party in Washington Court House on the night of the victim's murder.

Additional testing was ordered after this interview. Specifically, all of the materials that were wrapped around the victim' head were resubmitted to BCI. Michelle Yezzo, retired forensic scientist from

**4**

BCI also testified on behalf of the State at trial, explaining her role in testing the samples submitted right after the crime, prior to the availability of DNA testing. She testified that she initially determined, based upon the information provided to her which stated that Appellant was a black male, that the hairs recovered from the crime scene were not his, as they were Caucasian hair. She explained that had she known that Appellant was biracial, she would not have excluded him at that time.

Finally, Mark Losko, a DNA forensic scientist at BCI, testified for the State. He explained his role in re-testing the hairs recovered from the crime scene, once the evidence was resubmitted to BCI. He testified that his initial tests indicated there was a 1 in 682 chance that the hairs recovered did not belong to Appellant. After obtaining these initial results, all of the items that had been wrapped around the victim's head on the night of her murder were resubmitted to BCI for additional testing. Mark Losko testified that in examining these items he found additional pubic hairs, as well as semen. Losko testified that DNA comparison performed on the hairs indicated only a 1 in 28,340,000,000,000 chance that they did not belong to Appellant, explaining that such a match is a "very rare profile." However, as with the saliva evidence, the semen did not match Appellant's DNA profile.

After the completion of the State's case, Appellant moved for acquittal pursuant to Crim. R. 29. The trial court sustained the motion as to the complicity to aggravated murder count, but allowed the case to proceed as to the complicity to murder count, after which Appellant presented three alibi witnesses, including John Keaton, Timothy Buell and Lovie Marie Buell.

Each of Appellant's alibi witnesses confirmed that Appellant was at a party in Washington Court House on the night of the victim's murder. John Keaton testified that he, Appellant and a few others left Circleville at approximately 5:00 p.m. on the evening of July 20, 1990, and went to a party at Timothy Buell's house in Washington Court House. He testified that they stayed there until approximately 3:00 in the morning, at which point they left and returned to Circleville. Keaton testified that the group returned to his house, where Appellant "crashed" in a chair and was still there sleeping when Keaton later awoke. He also admitted on cross examination that he drank a lot that evening and smoked marijuana. Tim Buell and his wife, Lovie Marie Buell, essentially confirmed Appellant's alibi with their testimony, although in less detail.

> After hearing the evidence, the jury returned a verdict, finding Appellant guilty of complicity to murder. The trial court sentenced Appellant to an indefinite term of imprisonment of fifteen years to life.

*State v. Hollis*, No. 09CA9, 2010 WL 3294327, at *1-4 (Ohio App. 4th Dist. Aug. 5, 2010).

Represented by new counsel, Petitioner timely appealed, raising the following assignments of error:

> I. THE TRIAL COURT ERRED IN DENYING APPELLANT'S CRIMINAL RULE 29 MOTION TO ACQUIT AS THE STATE FAILED TO PRESENT SUFFICIENT EVIDENCE TO SUPPORT A CONVICTION FOR COMPLICITY TO MUR[DER].
>
> II. APPELLANT'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

*Id*. at *4. On August 5, 2010, the appellate court affirmed the judgment of the trial court. *Id.* On December 15, 2010, the Ohio Supreme Court dismissed Petitioner's subsequent appeal. *State v. Hollis,* 127 Ohio St.3d 1463 (2010).

On December 20, 2011,[1] Petitioner filed the instant *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He alleges that he is in the custody of the Respondent in violation of the Constitution of the United States based upon the following grounds:

> 1. The trial court erred in denying Petitioner's Crim. R. 29 as the State failed to present sufficient evidence to support a conviction for complicity to murder, 2923.03/ 2903.02(A).
>
> 2. The trial court erred in denying Petitioner's Crim. R. 29. The conviction was against [the] manifest weight of evidence.

It is the position of the Respondent that Petitioner's claims are without merit.

---

[1] Petitioner signed the petition on November 28, 2011.

**Merits:**

In claims one and two, Petitioner asserts that the evidence was constitutionally insufficient to sustain his conviction, and that his conviction was against the manifest weight of the evidence. To the extent that Petitioner asserts that the trial court violated State evidentiary rules, however, this claim fails to present an issue appropriate for federal habeas corpus review. *See* 28 U.S.C. 2254(a). A federal court may not issue a writ of habeas corpus "on the basis of a perceived error of state law." *Pulley v. Harris*, 465 U.S. 37, 41 (1984) (*Smith v. Sowders*, 848 F.2d 735, 738 (6th Cir. 1988). A federal habeas court does not function as an additional state appellate court reviewing state courts' decisions on state law or procedure. *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988). "'[F]ederal courts must defer to a state court's interpretation of its own rules of evidence and procedure' " in considering a habeas petition. *Id.* (quoting *Machin v. Wainwright,* 758 F.2d 1431, 1433 (11th Cir. 1985)).

Petitioner's claim that his conviction was against the manifest weight of the evidence likewise fails to present an issue appropriate for federal habeas corpus relief. The Due Process Clause does not provide relief for defendants whose convictions are against the manifest weight of the evidence, but only for those who have been convicted without enough proof to allow a rational trier of fact to find guilt beyond a reasonable doubt. *Walker v. Engle*, 703 F.2d 959, 969 (6th Cir. 1983). In the context of a claim alleging a violation of due process, "sufficiency of the evidence" refers to the due process requirement that there be enough evidence introduced in favor of the prosecution for a rational trier of fact to find each element of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In reviewing a sufficiency of the evidence claim, a federal habeas court must defer to the trier of fact with respect to issues of

conflicting testimony, weight of the evidence, and the credibility of the witnesses. *Jackson,* 443 U.S. at 319; *Walker,* 703 F.2d at 969.

However, under Ohio law, a claim that a verdict was against the manifest weight of the evidence-as opposed to one based upon insufficient evidence-requires the appellate court to act as a "thirteenth juror" and review the entire record, weight the evidence, and consider the credibility of witnesses to determine whether "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172, 175 (1983); *cf. Tibbs v. Florida*, 457 U.S. 31 (1982). Because a federal habeas court does not function as an additional state appellate court, vested with the authority to conduct such an exhaustive review, any claim that petitioner's conviction was against the manifest weight of the evidence cannot be considered by this Court.[2]

Petitioner does assert that the evidence was constitutionally insufficient to sustain his conviction on complicity to commit murder. The state appellate court rejected this claim in relevant part as follows:

> [W]hen reviewing a case to determine if the record contains sufficient evidence to support a criminal conviction, we must "examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Smith,* Pickaway App. No. 06CA7, 2007-Ohio-502, at ¶ 33, quoting *State v. Jenks* at paragraph two of the

---

[2] The state appellate court rejected Petitioner's claim that his conviction was against the manifest weight of the evidence in relevant part as follows:

> Appellant reminds us that he presented three alibi witnesses, all of which told the same basic story. He also challenges the jury's determination of guilt, which he claims was based solely upon the presence of his pubic hair at the crime scene. Appellant argues that he presented several different scenarios as to how his pubic hair may have been lost in the victim's home. He also argues that while the State proved that another person was present at the scene of the crime, by virtue of the presence of another person's semen and saliva on the victim's person and bedding, that it failed to prove that Appellant was present on the night of the crime. Thus, Appellant essentially argues that no rational trier of fact could have found that the State proved all of the essential elements of the crime.
>
> Despite these arguments, we find that Appellant's conviction is not against the manifest weight of the evidence. In making this finding, we considered much of the same evidence that we discussed in our resolution of Appellant's sufficiency of the evidence challenge. Most importantly, the DNA evidence links Appellant to the crime. Further, the additional DNA evidence which indicated the presence of another individual at the scene of the crime, as well as the testimony indicating that two people were necessary in order to gain access to the victim's residence through the open window, allowed the jury to infer that Appellant, at the very least, assisted and/or cooperated with another individual to enter the victim's home and participate in her murder.

8

syllabus. *See*, *also, Jackson v. Virginia* (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560.

The sufficiency of the evidence test "raises a question of law and does not allow us to weigh the evidence." *Smith* at ¶ 34, citing *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. Instead, the sufficiency of the evidence test " 'gives full play to the responsibility of the trier of fact [to fairly] resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Smith* at ¶ 34, quoting *Jackson* at 319. This court will "reserve the issues of the weight given to the evidence and the credibility of witnesses for the trier of fact." *Smith* at ¶ 34, citing *State v. Thomas* (1982), 70 Ohio St.2d 79, 79-80, 434 N.E.2d 1356; *State v. DeHass* (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus.

Appellant was convicted of complicity to murder, in violation of R.C. 2923.03 and 2903.02(A). The version of R.C. 2903.02 that was in effect at the time of the victim's murder provided in section (A) that "[n]o person shall purposely cause the death of another." R.C. 2923.03, forbidding complicity, states that "[n]o person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:* * * (2) Aid or abet another in committing the offense; * * *." Thus, in order to support a conviction for complicity to murder by aiding and abetting, it must be shown that the defendant "supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." *State v. Johnson* (2001), 93 Ohio St.3d 240, 2001-Ohio-1336, 754 N.E.2d 796, syllabus. The defendant's "intent may be inferred from the circumstances surrounding the crime." *Id*.

Appellant argues that the State's only evidence consisted of a few of his pubic hairs found at the crime scene and that the presence of a second person's semen and saliva at the crime scene indicated that another individual actually raped and murdered the victim. Further, while Appellant concedes that his pubic hair was found in the victim's bedding, he argues that no evidence was presented placing him at the scene of the crime on the day in question, offering instead alternative theories as to how his pubic hairs might have been lost in the victim's house. [FN4]

FN4. As previously noted, Appellant was familiar with the victim in that he had occasionally performed odd jobs for her. As such, he claimed that he had been in her house and had used her bathroom on previous occasions.

9

> Despite the arguments advanced by Appellant, we find sufficient evidence to support Appellant's conviction for complicity to murder. The State argues that because Appellant's pubic hairs, not arm, head or beard hair, were found in the bedding that was wrapped around the victim's head, that Appellant's presence and involvement in the crime were established. The State acknowledges the presence of DNA of another individual and argues that although it was unable to establish which perpetrator performed which act against the victim, it was able to show that two people were present at the scene of the crime. The jury reasonably inferred, no doubt based upon the DNA evidence, that Appellant was one of the two individuals.
>
> On appeal, the State focuses its argument on the fact that the specific DNA of Appellant's that was found at the crime scene was in the form of pubic hair, as opposed to any other type of hair. At trial, the State emphasized that the pubic hair was found in the victim's bedding, which was found wrapped around her head, as opposed to being found in bathroom, where Appellant claimed he had been on prior visits to the victim's house. Further, at trial the State also placed much emphasis on the fact that an overturned bucket was found underneath an open window to the victim's house, which was the determined point of entry. The State demonstrated at trial that even with the bucket placed under the window, entry through the window required one individual to hoist the other individual up and through the window.FN5 The State argued, and the jury apparently agreed, that this evidence indicated that two individuals, one of which was Appellant, cooperated together in entering the victim's residence, and ultimately murdering her.
>
> FN5. This was demonstrated through the testimony of the officers that initially responded to the victim's home for what began as a well-being check.
>
> As such, after reviewing the foregoing evidence in a light most favorable to the State, we believe that any rational trier of fact could have found the essential elements of complicity to murder proven beyond a reasonable doubt. Thus, we find sufficient evidence to support Appellant's conviction and, as a result, conclude that the trial court did not err in denying Appellant's Crim.R. 29 motion for acquittal. Accordingly, we overrule Appellant's first assignment of error.

*State v. Hollis*, 2010 WL 3294327, at *5-6.

The factual findings of the state appellate court are presumed to be correct:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1). Further, a federal habeas court may not grant relief unless the state court's decision was contrary to or an unreasonable application of clearly established federal law, or based on an unreasonable determination of the facts in light of the evidence that was presented.

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  In order to obtain habeas corpus relief, a petitioner must show that the state court's decision was "'so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Bobby v. Dixon,* -- U.S. -- , 132 S.Ct. 26, 27,  (2011) (quoting *Harrington v. Richter*, 562 U.S.-- --, 131 S.Ct. 770, 786–87 (2011)).  This bar is "difficult to meet" because "habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington*, 131 S.Ct. at 786 (quoting *Jackson v. Virginia,* 443 U.S. 307, 332, n.5 (1979) (Stevens, J., concurring in judgment)). In short, "[a] state court's

determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id*. (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Before a criminal defendant can be convicted consistent with the United States Constitution, the record must contain sufficient evidence to justify a reasonable trier of fact to find guilt beyond a reasonable doubt. *Jackson*, 443 U.S. at 319. To determine whether the evidence was sufficient to support a conviction, this Court must view the evidence in the light most favorable to the prosecution. *Wright v. West*, 505 U.S. 277, 296 (1992) (citing *Jackson*, at 319). The prosecution is not affirmatively required to "rule out every hypothesis except that of guilt." *Id*. (quoting *Jackson*, at 326). "[A] reviewing court 'faced with a record that supports conflicting inferences must presume—even if it does not appear on the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Id*. (quoting *Jackson*, at 326).

Federal habeas courts must afford a "double layer" of deference to state court determinations about the sufficiency of the evidence to sustain a conviction. As explained in *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009), deference is due the jury's finding of guilt because the standard, announced in *Jackson v. Virginia*, is whether "viewing the trial testimony and exhibits in the light most favorable to the prosecution, *any rational trier of fact* could have found the essential elements of the crime beyond a reasonable doubt." Even if a *de novo* review of the evidence leads to the conclusion that no rational trier of fact could have so found, a federal habeas court "must still defer to the *state appellate court's* sufficiency determination as long as it is not unreasonable." *Id.;* s*ee also White v. Steele*, 602 F.3d 707, 710 (6th Cir. 2009). This is a substantial hurdle for a habeas corpus petitioner to overcome and Petitioner has not done so here.

As discussed by the state appellate court, construing all of the evidence in the light most favorable to the prosecution, the State established that Petitioner and another unknown person were present at the scene, having entered through the window of the Cook's home, brutalizing and killing her.  Neither the jury, nor this Court, in reviewing a claim for sufficiency of the evidence, is required to believe Petitioner's alibi witnesses or his explanations for the presence of his pubic hair in the blanket that was found wrapped around the victim's head.  That being the case, and for the reasons detailed by the state appellate court, Petitioner's claim of insufficiency of the evidence fails to provide him the relief he seeks.

**WHEREUPON**, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED**.

**Procedure on Objections:**

If any party objects to this *Report and Recommendation*, that party may, within fourteen (14) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A judge of this Court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo,* and also operates as a waiver of the right to appeal the decision of

the District Court adopting the *Report and Recommendation. See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

                                                                                           s/ *Elizabeth A. Preston Deavers*
                                                                                           Elizabeth A. Preston Deavers
                                                                                           United States Magistrate Judge

Date:  November 25, 2013